IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch


Civil Action No. 11-CV-01516-RPM

NAMBE PUEBLO HOUSING ENTITY,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD),
SHAUN DONOVAN, Secretary of HUD,
SANDRA HENRIQUEZ, Assistant Secretary for Public and Indian Housing, and
DEBORAH LALANCETTE, Director, HUD's Office of Grants Management, National Office of
Native American Programs,


      Defendants.

---

MEMORANDUM OPINION AND ORDER ON ISSUES PRESENTED IN THE
SPECIAL BRIEF OF  PLAINTIFF NAMBE PUELBO HOUSING ENTITY

---

Plaintiff Nambe Pueblo Housing Entity is a governmental agency of the Nambe Pueblo, a

federally recognized Indian Tribe in New Mexico. The Plaintiff is a Tribally Designated Housing

Entity (TDHE), authorized to receive and administer Indian Housing Block Grant (IHBG) funds

awarded annually to the Tribe by the United States Department of Housing and Urban

Development (HUD). HUD is the federal agency within the United States government

designated to oversee and administer housing assistance to eligible Indian Tribes pursuant to the

Native American Housing Assistance and Self-Determination Act (NAHASDA), 25 U.S.C.

§ 4101 *et seq.* The IHBG program and the formula for determining each Tribe's share of the

annual NAHASDA appropriation are described in *Fort Peck Housing Authority v. HUD*, 435 F.

Supp. 2d 1125, 1127-28 (D. Colo. 2006), *rev'd* 367 Fed. Appx. 884 (10th Cir. 2010)

(unpublished), *cert. denied*, 131 S.Ct. 347 (2010).

On June 10, 2011, Nambe Pueblo Housing Entity (Nambe Pueblo) filed this action

pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, challenging HUD

determinations that resulted in the elimination of certain Mutual Help units from the Formula

Current Assisted Stock (FCAS) component of Nambe Pueblo's IHBG allocation and reductions

to Nambe Pueblo's grant allocations for fiscal year (FY) 2006 and subsequent years.

This action is one of several related actions pending in this court involving challenges to

HUD's reductions of the plaintiffs' IHBG awards and HUD's authority to recapture purported

grant overfunding. Legal issues common to the related actions have been decided in the

Memorandum Opinion and Order dated August 31, 2012, in *Fort Peck Housing Authority v.

HUD et al.*, Civil Action No. 05-cv-00018-RPM. Nambe Pueblo and the Defendants

(collectively, HUD) have submitted briefs addressing issues unique to the claims of Nambe

Pueblo. Arguments of counsel were heard on May 30, 2012.

Nambe Pueblo challenges a series of HUD determinations regarding the FCAS eligibility

of twenty-three (23) units in two housing projects known as NM99B040011 (Project 11) and

Project NM99B040013 (Project 13). These projects are located in northern New Mexico on the

reservation of the Pueblo of Nambe, on land held in trust by the United States Government.

Nambe Pueblo also disputes HUD's determinations regarding the FCAS eligibility of one unit in

another project known as Project 17. During oral argument Plaintiff's counsel stated that

disputes about the one unit in Project 17 could be determined, if necessary, during the counting

phase of the coordinated proceedings. Accordingly, this opinion and order addresses only the challenged agency determinations regarding the 23 units located in Projects and 11 and 13.

The subject housing projects were built in the 1980s. At that time, the Northern Pueblos Housing Authority, an Indian Housing Authority, was acting on behalf of several tribes, including Nambe. (*See* Pl.'s RA 7, at p. 5 of 10). Northern Pueblos Housing Authority held land leases for the subject projects. (*See id*.)

In 1998, the Pueblo of Nambe withdrew from the Northern Pueblos Housing Authority and created Nambe Pueblo Housing Entity to be its tribally designated housing entity. (Pl.'s RA 7 at p. 6). In 1999, Nambe Pueblo Housing Entity assumed responsibility for the management of housing units located in the subject projects.

Transfer of legal ownership of the projects from Northern Pueblos Housing Authority to Nambe Pueblo required the execution and recording of quitclaim deeds for the projects and the execution of new land leases to Nambe Pueblo. The Bureau of Indian Affairs (BIA) Division of Land Titles and Records has responsibility for recording and maintaining documents affecting title to Indian Land.

In 2003, Northern Pueblos Housing Authority and Nambe Pueblo signed a quitclaim deed by which Northern Pueblos Housing Authority quitclaimed Project 11 to Nambe Pueblo. (*See* Pl.'s RA 7 at 6 (describing the quitclaim process)). In 2005, the quitclaim deed was amended to include Project 13. The amended quitclaim deed was sent to the BIA for approval and was recorded in the Land Titles and Records Office on October 6, 2006. (*Id*.) In December 2006,

Nambe Pueblo learned that the amended quitclaim deed for Projects 11 and 13 had been recorded. (*See* Pl.'s Ex. at to Pl.'s RA 7).[1]

There are a total of 47 Mutual Help units in Projects 11 and 13. The date of full availability (DOFA) for those units was September 30, 1980, which indicates that the 25-year "lease-purchase" period generally would have expired on or about October 1, 2005. After that date, Nambe Pueblo continued to operate and maintain the units and did not convey them to the homebuyers.

As the operator of the projects, Nambe Pueblo charged administrative fees to the homebuyers. Some homebuyers refused or failed to pay those fees, which resulted in the accumulation of tenant account receivables (TARs).

On Nambe Pueblo's Formula Response Form for FYs 2005, 2006, 2007 and 2008, the 47 units were included in the Tribe's FCAS inventory. For those fiscal years, the annual allocations which HUD paid to Nambe Pueblo included FCAS funding for those units.

On June 23, 2008, HUD sent a letter to Nambe Pueblo questioning the FCAS eligibility of the 47 Mutual Help units in Projects 11 and 13. (Defs.' RA C). HUD's letter pointed out that the 25-year lease-purchase period should have expired on October 1, 2005, and requested information about why the Tribe had not conveyed the units to the homebuyers.

In July 2008, representatives of the BIA and Nambe Pueblo met and discussed the process of recording quitclaim deeds to homebuyers. (Pl.'s RA 7, Ex. B). The BIA advised Nambe Pueblo that the Tribe would need to prepare quitclaim deeds for units to be conveyed and

---

[1]In Nambe Pueblo correspondence to HUD, Nambe Pueblo mistakenly identified the date of recording as December 15, 2006.  *See* Pl.'s reply br. at 7, n.3 (explaining the error).

submit the deeds to the BIA for approval and filing at the Southwest Regional Office, Division of Land Titles and Records Office. Around this time it was also discovered that a new Master Lease needed to be recorded for Projects 11 and 13 before the BIA could approve quitclaim deeds to homebuyers. (*Id.*)

In a letter dated September 18, 2008, Nambe Pueblo responded to HUD's inquiry about the status of the 47 units, identifying each unit, the name of the homebuyer, and the conveyance status. The Tribe explained that between April, 2007 and January, 2008, Nambe Pueblo had delivered quitclaim deeds for 24 units to the BIA for approval and recording, and the Tribe was still waiting for BIA approval or recording of the deeds. With respect to the other 23 units, Nambe Pueblo explained:

- 9 units had no delinquent balances in 2005 and Nambe Pueblo was awaiting Board action to convey the units;

- 6 units had not been conveyed because there were delinquent accounts, which Nambe Pueblo had addressed through payback agreements;

- 3 accounts were paid off and Nambe Pueblo was awaiting execution of quitclaim deeds by the homebuyers;

- 1 account was paid off but still under Nambe Pueblo's management because it was receiving renovation work;

- The Board was expected to approve conveyances of 4 units in October 2008.

(Defs.' RA D).

In a letter dated November 18, 2008, HUD informed Nambe Pueblo of HUD's determination that five (5) Mutual Help units in Projects 11 and 13 had become ineligible for

FCAS funding as of fiscal year 2006. (Defs.' RA E). HUD stated that TARs were not a sufficient reason for delaying conveyance, citing NAHASDA Guidance 98-19, which states: "Because promissory notes can be issued, TARs alone are not adequate grounds for failure to convey units that are otherwise conveyance eligible."[2] HUD informed Nambe Pueblo that the Tribe had incorrectly received grant funds in the following amounts: $14,506 for the 5 units for fiscal year 2006; $15,757 for the 5 units fiscal year 2007, and $16,181 for the 5 units fiscal year 2008. HUD stated that Nambe Pueblo would need to repay the overfunded amount of $ 46,161. (Defs.' RA E).[3]

With respect to the remaining 42 units, HUD stated, "We are working with the BIA on the quitclaim process ... In the interim, the units will remain on the Tribe's FCAS until we can make a determination of their eligibility for funding under the IHBG program." (*Id.*) HUD informed Nambe Pueblo:

> Should you disagree with this decision, you have the right to file an appeal within 30 days of the date of this letter. HUD's policy is to afford tribes the same appeal rights afforded tribes who dispute data in accordance with [24 C.F.R.] § 1000.336.

(Defs.' RA E).

On November 21, 2008, Nambe Pueblo learned that the BIA had been unable to record Nambe's quitclaim deeds to homebuyers because a Master Lease for Projects 11 and 13 had not yet been recorded, although the Master Lease had been transmitted for recording on September 17, 2008. (Pl.'s RA 7, Ex. B).

---

[2]Guidance 98-19 is attached as RA 4 to the Plaintiffs' coordinated opening brief.

[3]Those 5 units were identified as Unit Numbers 8, 19 and 101 in Project 11, and Unit Numbers 116 and 133 in Project 13.

In a letter to HUD dated December 17, 2008, Nambe Pueblo appealed HUD's decision about the 5 units which HUD had determined were no longer eligible for FCAS funding. (Defs.' RA F). Nambe Pueblo explained that TARs were not the only reason these units had not been conveyed. Nambe Pueblo stated that title problems had prevented timely conveyance, explaining that Nambe Pueblo had not received quitclaim deeds for the Projects from Northern Pueblos Housing Authority until late 2006, and the BIA was unable to transmit quitclaim deeds for units in the two projects until the Master Lease was recorded, and that had not occurred. Nambe Pueblo also disputed HUD's policy about TARs. Nambe Pueblo argued that the Tribe was authorized under the Mutual Help Occupancy Agreements (MHOA) to maintain the legal right of ownership until receipt of full payment, and HUD's policy was inconsistent with the language of 24 C.F.R. § 1000.318. Finally, Nambe Pueblo argued that Guidance 98-19 was unreasonable because "it makes no reasonable or legal sense for a [tribally designated housing entity] to convey a unit and enter into a promissory note to collect the account receivable on the unit, since without eviction as an enforcement tool, the [tribally designated housing entity] has no legal means of enforcing a promissory note." (*Id.*)

In a letter to Nambe Pueblo dated April 21, 2009, HUD informed Nambe Pueblo that eighteen (18) additional units in Projects 11 and 13 would be removed from Nambe Pueblo's FACS as of fiscal year 2006. (Defs.' RA G). HUD reiterated its policy regarding TARs and stated that delays in obtaining BIA approval did not justify the failure to convey the units because the "quitclaims were not presented to the Board until FY 2008, three years after conveyance eligibility." (*Id.*) HUD informed Nambe Pueblo that it had erroneously received

grant funds in the following amounts:  $52,221 for the 18 units for fiscal year 2006; $55,706 for

the 18 units fiscal year 2007, and $58,250 for the 18 units fiscal year 2008. HUD's letter stated

that Nambe Pueblo would need to repay the overfunded amount of $166,177, in addition to the

$46,161 identified in HUD's letter dated November 18, 2008. (*Id.*) HUD's letter dated April 21,

2009 informed the Tribe of its right to file an appeal pursuant to 24 C.F.R. § 1000.336.

In a letter dated April 29, 2009, HUD denied the Tribe's appeal with respect to the

5 units, stating:

> ... recipients receiving IHBG funds are responsible for operating and maintaining
> 1937 Housing Act units. Part of this responsibility is to ensure compliance with
> the terms of the Mutual Help and Occupancy Agreement (MHOA), including
> timely conveyance of the units. While the Tribe did not own the units on
> December 18, 2008, it was receiving funding for the units, and was responsible
> for their operation through ... the [Northern Pueblos Housing Authority].
> Therefore, these units will remain ineligible for FCAS, as stated in HUD's
> November 18, 2008 letter.

With respect to the title impediment caused by delays at the BIA, HUD stated:

> These units were conveyance-eligible in FY 2005, which was 4 years before the
> Tribe knew that the BIA would not be able to process any quitclaim deeds. The
> Tribe did not submit information addressing its efforts to process these units for
> conveyance during this 4-year period. Because the Tribe did not demonstrate that
> reasons beyond its control made a timely conveyance practical [sic], these five
> units will remain ineligible as FCAS, as stated in HUD's letter of November 18,
> 2008.

(Defs.' RA H). HUD also stated "TARs alone are not adequate for non-conveyance of a unit,"

citing Guidance 98-19. (*Id.*)

Nambe Pueblo appealed HUD's determination regarding the 18 units in a letter to HUD

dated May 20, 2009, and a supplemental letter dated July 2, 2009. Nambe Pueblo again

explained  the title impediments and protested HUD's policy about TARs. (Defs.' RA I). By

letter dated June 3, 2009, Nambe Pueblo sought reconsideration of HUD's denial of its appeal

regarding the 5 units, arguing that HUD had ignored the tribe's explanations about why conveyance of these units was not practicable. (Defs.' RA J).

In a letter to Nambe Pueblo dated August 7, 2009, HUD denied the Tribe's appeals. (Defs.' RA K). On September 17, 2009, Nambe Pueblo sought reconsideration. (Defs.' RA L).

In a letter to Nambe Pueblo dated February 3, 2010, HUD denied the Tribe's requests for reconsideration of the removal of the 5 units and the 18 units from Nambe Pueblo's FCAS inventory. (Defs.' RA M).

With respect to the other 24 units located in Projects 11 and 13, HUD accepted Nambe Pueblo's explanation that delays by the BIA prevented conveyance.[4]

In a letter to Nambe Pueblo dated May 14, 2010, HUD demanded repayment of $166,177, stating that HUD would recover that debt by adjusting the Tribe's grant allocations for fiscal years 2011-15, by reductions of $33,235 in each fiscal year. (A.R. 63). HUD's letter dated May 14, 2010, also stated that the Tribe still owed $46,161, and that amount would be recovered by a reduction of the tribe's grant allocation for fiscal year 2010. *Id.*

Nambe Pueblo alleges that the 23 units located in Projects 11 and 13 were eligible for FCAS funding in fiscal years 2006-08 and remained eligible for FCAS funding in fiscal year 2009 to the present, claiming that HUD's determinations about the disputed units violated the NAHASDA regulatory scheme and breached trust obligations owed by HUD to the Tribe.

---

[4]HUD continued to provide FCAS funding for those 24 units through FY 2010. (Defs.' RA W, letter dated September 8, 2011 from HUD to Nambe Pueblo; *see also* Defs.' resp. br. at 19, "[T]he 24 homeownership units in Proejcts NM99B04011 and NM99B040013 were determined eligible for FCAS funding through FY 2010.")

A question unique to Nambe Pueblo's action is whether the 3-year limitations period provided in 24 C.F.R. § 1000.319 precluded HUD from adjusting the Tribe's FCAS inventory for FY 2006 and barred HUD from recapturing FY 2006 grant funds.

24 C.F.R. § 1000.319 provides:

(a) A recipient is responsible for verifying and reporting changes to their Formula Current Assisted Stock (FCAS) on the Formula Response Form to ensure that data used for the IHBG Formula are accurate (see § 1000.315). Reporting shall be completed in accordance with requirements in this Subpart D and the Formula Response Form.

(b) If a recipient receives an overpayment of funds because it failed to report such changes on the Formula Response Form in a timely manner, the recipient shall be required to repay the funds within 5 fiscal years. HUD shall subsequently distribute the funds to all Indian tribes in accordance with the next IHBG Formula allocation.

(c) A recipient will not be provided back funding for any units that the recipient failed to report on the Formula Response Form in a timely manner.

(d) **HUD shall have 3 years from the date a Formula Response Form is sent out to take action against any recipient that fails to correct or make appropriate changes on that Formula Response Form. Review of FCAS will be accomplished by HUD as a component of A-133 audits, routine monitoring, FCAS target monitoring, or other reviews**.

(emphasis added). The effective date of this regulation was May 21, 2007.

For FY 2006, the 3-year limitations period ended on August 1, 2008, because the Formula Response Form for FY 2006 was sent on August 1, 2005.

The focus of this limitations dispute is the meaning of the phrase "take action" in subsection (d). HUD asserts it "took action" on June 23, 2008, when HUD sent a letter to Nambe Pueblo questioning the FCAS eligibility of 47 mutual help units. HUD admits that the regulation is ambiguous, but asserts that its interpretation is reasonable and should be entitled to deference.

Because the limitation is self-imposed there is some appeal to the argument that HUD's view should be accepted by the court. The better view is that the ambiguity may be resolved against its author and the more reasonable interpretation is that "take action" refers to the time HUD notifies the recipient that the agency has adjusted the reporting data.

HUD's letter dated November 18, 2008 was the first notification to Nambe Pueblo of the agency's decision to remove 5 units from the Tribe's FCAS inventory. HUD's letter dated April 21, 2009 was the first notification to Nambe Pueblo of the agency's decision to remove an additional 18 units from the Tribe's FCAS inventory. Because those notifications occurred more than three years after August 1, 2005, HUD's adjustments to Nambe Pueblo's funding for FY 2006 were untimely, and HUD may not recover approximately $66,700 from Nambe Pueblo for fiscal year 2006.

Even if HUD's interpretation were correct, HUD did not "take action" with respect to FY 2006 by its letter dated June 23, 2008. It only asked for more information about the units, with reference to FYs 2007, 2008 and 2009. (*See* Defs.' RA C).

Nambe Pueblo also claims that HUD violated 25 U.S.C. § 4161 (prior to amendment), 25 U.S.C. § 4165, and 24 C.F.R. § 1000.532, when it adjusted the Tribe's FYs 2006-08 grant allocations without providing an opportunity for a hearing and without making findings of substantial noncompliance.

In 2008, as part of the Reauthorization Act, 25 U.S.C. § 4161 was amended to provide that a recipient's failure to report its FCAS inventory in accordance with 25 U.S.C. § 4152(b)(1) "shall not, in itself, be considered substantial noncompliance for purposes of NAHASDA's

Title V." 25 U.S.C. § 4161(a)(2)(2008). Here, because the challenged agency actions occurred after the effective date of that amendment, no hearing was required.

The rulings made in *Fort Peck Housing Authority v. HUD et al.*, Civil Action No. 05-cv-00018-RPM, on August 31, 2012, are applicable to this case, including the conclusion that Guidance 98-19 is invalid.

The primary issue presented is whether title impediments caused by delays attributable to the BIA prevented Nambe Pueblo from effecting conveyance of the 23 units in Projects 11 and 13. Nambe Pueblo argues it was inconsistent and arbitrary for HUD to determine that 23 units were ineligible for FCAS funding when 24 units in those same Projects remained eligible for FCAS funding. Nambe Pueblo emphasizes that the same title impediment – i.e., the BIA's delay in obtaining and recording a new Master Lease for Projects 11 and 13 – precluded conveyance of all 47 units and this impediment was beyond the control of the Tribe.

HUD asserts that Nambe Pueblo did not make reasonable efforts to convey the 23 units because the Tribe did not prepare quitclaim deeds for those units and did not submit quitclaim deeds to the BIA for approval and recording.

That decision was arbitrary and capricious because the Tribe's failure to prepare and submit quitclaim deeds to the BIA was irrelevant. The BIA's delay in the recording of the Master Lease created the same title impediment for all 47 units. HUD faults the Tribe for not taking action that would have been futile.

HUD argues that its determinations are entitled to deference. That argument is not persuasive. The weight to be given to the agency's judgment in a particular case "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency

-12-

with earlier and later pronouncements, and all those factors which give it power to persuade ... ."

*Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944). Here, HUD's decisions are the result of faulty

reasoning. HUD blindly ignores the realty that delays attributable to the BIA would have

precluded Nambe Pueblo from effecting timely conveyance of the 23 disputed units, even if the

Tribe had prepared quitclaim deeds for the units.

Nambe Pueblo also challenges HUD's authority to recapture grant funds previously

awarded for FYs 2006-08, asserting that under NAHASDA's pre-amendment remedial scheme,

HUD had no authority to recapture grant funds previously awarded which the recipient has spent

on affordable housing activities.

The question of HUD's recapture authority will be determined in the next phase of the

coordinated litigation.

SO ORDERED.

Dated:  September 4, 2012

BY THE COURT:


s/ Richard P. Matsch
_____

Richard P. Matsch, Senior District Judge